The second case of the afternoon, that's No. 23-50669, Van Loon v. Department of Treasury, Mr. Shanmugam. Thank you, Judge Jones, Canon Shanmugam of Paul Weiss for the appellants. May it please the Court, this case involves a novel effort by the Department of the Treasury to impose sanctions not on foreign persons, property, or nations, but rather on immutable open-source software code that is used to protect the privacy of persons who transact in cryptocurrencies. Enacted in 1977, the relevant statute, IEPA, permits the Department to regulate only property in which a foreign national has an interest. But with regard to the Tornado Cash software project, the Department cannot settle on a coherent explanation for why it has identified a national property or an interest. The disparate group of individuals forming the purported Tornado Cash entity do not share any common purpose. The immutable smart contracts at issue do not constitute property because they are incapable of being owned. And the purported entity here does not have a beneficial interest in the immutable smart contracts. The Department has failed to show why its existing designation of the North Korean entities that use Tornado Cash is insufficient. And if the Department wishes to regulate American citizens' use of open-source software code such as Tornado Cash, it should seek authority to do so from Congress, as it has already done. But the Department's effort to assert that authority under IEPA is a classic example of trying to put a square peg into a round hole. The district court erred by granting summary judgment to the government here, and that judgment should be reversed. Now, in my time this afternoon, I'd like to spend just a few minutes on the entity requirement and then focus primarily on the property requirement, which I think is perhaps the straightest line to reversal here. With regard to the entity requirement, the Department's obligation under the statute is to identify a foreign national. Now, if you look at the government's brief at pages 21 to 22, the government, I think, concedes that in order to meet this requirement, it must identify a body of persons who have combined to execute a common purpose, that is, the ordinary dictionary definition of an association, which is the relevant category here, I think, of a non-natural person. Now, the government does not defend the district court's conclusion as to this requirement, which was that the common purpose here, the common purpose of the entity, the developers of Tornado Cash and torn token holders, was, quote, developing, promoting, and governing Tornado Cash. Instead, the government's argument before this court is that those individuals share a common purpose of profiting from Tornado Cash. The problem with that argument is that the administrative record simply does not support that conclusion. The only people who conceivably could profit from Tornado Cash here, the only people who earn fees from the Tornado Cash software project, are a small subset of all torn holders, those who stake or lock up their tokens. And OFAC's definition of the sanctioned entity here sweeps much more broadly. It includes all torn holders, regardless of whether or not they stake their torn tokens, and also Tornado Cash's founders and other associated developers. And there's no evidence in the administrative record that those individuals even held torn at the time of the designation, much less that they were staking torn for profit. Now, what does the government say in response to all of this? Well, first of all, they say that everyone in the sanctioned entity had a shared purpose in profiting from an increase in the value of torn. But again here, the mere fact that torn holders might have expected such an increase to occur doesn't mean that they necessarily shared a common purpose. And again, the administrative record here contains no evidence that they did. Quite to the contrary, if you take a look at the administrative record, if you look at ROA 939, the government itself recognizes that individuals associated with the development of the Tornado Cash project asserted that torn was not an investment opportunity. And individuals plainly could have held torn for any number of purposes. They could have held it solely as a governance token or for some other reason. And one important thing to just stop and emphasize here is that torn is not a cryptocurrency here. For those of us who are relatively new to this space, when people talk about cryptocurrency, they're typically talking about Bitcoin or in this context, Ether referred to as ETH. These tokens serve a much different purpose. Now the government, I think, tries to draw an analogy to a corporation. They say, well, this sanctioned entity is sort of like the board and shareholders of a corporation. Now ordinarily, the reason why a corporation would be a person for purposes of IEPA is simply because it has a formal structure. It is in fact incorporated. Now if a corporation suffers from defects in the corporate form, then I think the question would be, does a corporation share a common purpose? And I think it would be easier to make an argument in the context of your typical for-profit corporation that the board and shareholders share the common purpose, the purpose of running that for-profit corporation and in the case of shareholders profiting from that. The same would be true for an unincorporated association like Al-Qaeda or Hamas. Clearly, they share a common purpose, their purpose of promoting terror. But the department here did not attempt to narrow its definition of the relevant entity to torn holders who, for instance, took a specific action, say staking their tokens for purposes of voting or for purposes of profiting from relayer contracts. And I don't think that the government can defend its overbroad designation by relying on harmless errors. This court recently reiterated in the Wages and White Lion case relying in turn on the Supreme Court's recent Chilcot versus FDIC case. An error can only be harmless under the APA if the agency would be required by law to take the same action no matter what. The government would not be required under IEPA to choose any of these narrower designations. And of course, if the government did, there would have to be an analysis about whether all of the other requirements are satisfied in light of that narrower designation. Are you suggesting that the government could take action which it believes is warranted for the reasons set forth but it would be a narrower order? Is that, is that? I think the government has suggested that it might be able to designate a narrower entity here. Okay. So that, but that gets us beyond the argument involving the definitions which is kind of the, as I see it, sort of the crux of the briefing is the. Yes. I understand the question, Judge Engelhardt. And I think what I would say is my point here is simply that the government can't say, well, because we could have come up with a narrower definition, we survive here on harmless errors. Right. That's understood. I'm just saying if we're going to argue about property and the definitional basis of the disagreement, if the government could take the action it sought and done it narrower, that might get us past a definitional argument. Well, I think our fundamental submission to this court is that even if the government could come up theoretically with a narrower definition of entity, the property requirement problem is insoluble. The government does not have an analogous argument on that requirement. So if the courts leave, given my time, I think I'd like to turn to that. Well, I am curious on the over breadth question. What could, to your mind, what could Treasury have done short of blocking tornado cash, short of shutting down tornado cash or blocking the software or immutable smart contracts across the board? Is there a more finely tuned and narrowly tailored step they could have taken? So I don't think that there is with regard to the immutable smart contracts themselves. That's where our property argument comes in here. Because the fundamental requirement here, if you take a look at Section 1702A1B, is that the government's authority reaches only transactions involving any property in which a foreign national has an interest. And here our argument with regard to property is quite simple. It is that what we're talking about here with regard to the immutable smart contracts is open source software. That is not capable of being owned, which is, of course, the familiar understanding of what the word property means. There's a lot of back and forth about the regulation here. And in the wake of Loper-Bright, I think all I would say is this. First, that the district court purported to afford uber deference, even greater deference than the Chevron standard, to Treasury's interpretation here. That's just obviously improper now in the wake of Loper-Bright. With regard to the regulation, let me say this. We're not here challenging the regulation because we think we prevail really regardless. Our frontline submission to this court is that all that the court needs to say is that with regard to these immutable smart contracts, and the name is a little bit misleading here, all we're talking about here is software available to anyone. It's not like Windows, which is owned by Microsoft. There is no owner of this software. It is available to the world, and it is immutable, and therefore, it's not property. Now, what's the government's response to that? The government's response to that is to kind of run away from the software itself and to say, well, look at this regulatory definition. We can characterize this as a contract or a service. Now, our submission, as we explained in the brief, is that when you're looking at those regulatory terms, they still have to be capable of being owned. If you talk about a contractual right or the right to, for instance, conduct a service, say you're the trash operator for Orleans Parish, you have a franchise right, those things are property in the conventional sense. Here, there's no contract. What we're talking about here, even though it's labeled a smart contract, is essentially an app. And precisely because it's immutable, there is no other person on the scene. When someone accesses these apps, they operate automatically. And the reason why this is different from a vending machine is that if you go to a vending machine to get a soda pop, you know that there is a vendor who is the counterpart to that contract when you put in your dollar. You may not know who that vendor is. You might be able to look on the side of the machine and find out. Here, there is no counterparty. Even if you were dealing with a mutable smart contract, it would be a weird analogy to say that the people who can alter the contract are the counterparties. But by virtue of the fact that these contracts are immutable, and they were rendered immutable well before the Treasury's efforts to impose sanctions here, the fact that they're immutable means that there is nobody on the other side of this transaction. You put... Does it matter that the person or entity responsible for, you used the term an app, immutable contract likening it to an app, does it matter if the person responsible for creating it or making it available makes any sort of profit on it? So I think that that would go only to the question of whether or not there was an interest. I don't think it really goes to the question of whether or not it's property itself. And keep in mind, the reason why we don't think that there is an interest here is because to the extent that anyone makes a profit here, they make a profit from something else. The something else here are these mutable relay or registry contracts, which are a way of essentially anonymizing the fee used, the fee that is required to be paid for using the immutable smart contracts. Not all of the people who use the immutable smart contracts take advantage of that service. And so really none of that has anything to do with the status of immutable smart contracts itself. And to address one of the other arguments made by the government, and I want to circle back to Judge Willett's question. One of the other arguments that the government makes is, well, you know, you point out, we point out the fact that, you know, there's no right to exclude or no right to control. Of course, property involves a significant bundle of rights and you don't have to have all of those rights in order to have property. I guess my response to that and my question for my friend, Mr. Hinshelwood, is what rights are implicated here? My dim recollection of first year property is that property includes rights like possession and use and enjoyment. None of those rights are implicated here. Again, this app exists on the internet. It's not even controlled in any meaningful way through the Tornado Cash website. The government makes the point that the Tornado Cash website could take down access to the smart contracts, but they would still exist on the blockchain and they would still continue to operate. And so this brings me back to Judge Willett's question, which is sort of the question of what can Treasury do here? We are not disputing that there is a problem, which is that although the vast majority of the uses of software like this are legitimate, as our plaintiffs demonstrate, that there are some number of people who use these apps for illicit purposes. We point out that there are tools even under IEPA in the sense that those people who use these apps illicitly can themselves be designated such that transacting with those individuals would be impermissible. But I think that the best evidence in some sense that IEPA is not really fit for this purpose in the sense that the government cannot directly operate on the, regulate these contracts, is the document that we cite in our reply brief, which is a document produced by Treasury indicating that Treasury needs additional tools to regulate. And if you look at that document, it's a memo dated November 28th, 2023. At page three, the government asks Congress to give it explicit IEPA authority to designate blockchain nodes or other elements of cryptocurrency transactions. Ironically enough, citing the fact that the recent Tornado Cash litigation presents this potential problem, which is that these smart contracts may not constitute property. So I think our submission is that to the extent that the government is seeking to regulate these uses, it needs additional tools. And the last thing I would say in one sentence, because I see that my red light is on, is that if you step back and think about what IEPA does, all that IEPA does is give the government to regulate persons within the jurisdiction of the United States. And so to this day, Tornado Cash remains available for persons outside the United States to use, and we have not submitted this to the court, but there is a recent government report from the New York Fed indicating that people are continuing to use Tornado Cash because the regulatory jurisdiction of the United States obviously does not take that offline. Unless the court has any further questions, I've reserved the balance of my time for rebuttal. All right. Thank you. Thank you. We'll hear next from Mr. Hinchelwood. Good afternoon, Your Honors. May it please the court, Brett Hinchelwood on behalf of the government. Tornado Cash developed, maintains, and improved a cryptocurrency mixing service that North Korea has used to launder millions of dollars in stolen cryptocurrency to fund its ballistic missile and weapons of mass destruction. Well, who knows how many other groups have misused it? Right. I mean, I think a lot. Isn't that exactly what happens and used to happen in Swiss banks? Well, Your Honor, I can't speak to the Swiss banking system, but what I can say is that the Department of the Treasury has consistently taken action with respect to all manner of financial transactions and institutions to address their funding or their assistance of, you know, illicit activities by Iran, North Korea, Hamas, you name it. Isn't he correct, though, that you can prevent Tornado Cash from operating within the U.S.? You can't prevent the North Koreans from operating it from Canada, right? Your Honor, I think there's a few things in there. One is North Korea doesn't directly operate this service. I know what you mean. Utilize the service. Your Honor, I mean, but that describes every bank or entity that the Department of the Treasury sanctions. I mean, anytime we sanction a bank in Iran, of course people can continue to transact with that bank if they're not subject to our jurisdiction. That doesn't mean that we don't think sanctions are important and effective tools in addressing, you know, those particular threats to the United States. It's just that, you know, there's obviously some natural limit on how much we can do. So, I mean, I think just to take the specific issues in this case sort of in the order that my colleague addressed them, I mean, the first question is just whether under the executive orders, one governing malicious cyber activity addressing that and the other addressing North Korea's weapons programs, we've identified, you know, some entity that, you know, is designated as having assisted North Korea and other malicious cyber activities. And Tornado Cash is precisely such an entity. I mean, it's essentially, if you look at what Tornado Cash is, it's a group of individuals who created and maintain the service and continue to develop new features and put them out there for the world to use. And then also a group of folks who hold what is essentially stock in Tornado Cash. They hold this token called TORN. And TORN confers the same kind of rights you would expect to see from stock in an ordinary corporation. You can vote on changes to the service. You can vote on, you know, governance proposals is how the organization described them. And you can, you know, you can sell those tokens on a secondary market just like you can sell stock on the stock exchange. And, you know, that those tokens themselves have value. But those aren't anything that actually operate Tornado Cash. That's correct. So this is, I mean, at the moment. You're just, you're a solution in search of an entity in a way. No, I mean, in the same way that I think we would say a corporation and its shareholders are an entity that can be designated, Tornado Cash and its shareholders are an entity. I mean, plaintiffs don't dispute. I don't take it. I don't take them to dispute that there is an entity out there that's Tornado Cash. Their only dispute is whether the Tornado Cash entity is properly described as including all of the shareholders or only some of the shareholders. I mean, this was the interesting thing to me, though. There was, there was this back and forth between the district court and in the briefs. Is it all holders of TORN? Is it the people who developed Tornado Cash who may not even hold TORN anymore? Is it, you know, is it a subset of TORN holders? How can it be one of three different groups and then each have an interest in this property? Okay, well. Either they all do or none of them do, it seems to me. So, so our view certainly is that all of them do and, and, you know, that's in the same way that every shareholder in a corporation and its board all have an interest in the corporation or, or, you know, are all part of a single entity that share a common purpose. We don't think that's a particularly controversial proposition and I took my colleague, frankly, to say. But if all, if, if the people who developed the founders of the Tornado Cash program are no longer associated with it and don't hold TORN, then are they part of the entity or not? I want to address that specific factual claim. So if you look at the pages 937 and 967 of the Record on Appeal, what the agency explained is that at the time when, when TORN was created, Tornado Cash said it was going to distribute 30% of the TORN to the original founders and developers and it was going to unlock that TORN over a period of years. So through the whole period of time, those individuals were receiving TORN at a regular, at regular intervals and that is more than substantial evidence to conclude that those individuals held TORN for purposes of concluding that they, you know, are part of the entity. So I, just on a factual level, I think it's plainly incorrect to suggest that they didn't have TORN or that there's any doubt or any substantial doubt about whether they had TORN and at that point, then we're really just to the question of whether we think that, you know, all the shareholders in the company generally have a common purpose. I think it's plain that we would ordinarily think that's true and my colleague said, well, if there's some defect in the paperwork, we still ordinarily think. Well, suppose you pick all the people in a stadium at a baseball game and they're all fans, does that mean they're an entity? I don't think that there's any question here that the, I mean, whether they ever have a common purpose with respect to TORNADO Cash is a separate question, I think, from whether they share outside interests in the world, sports fandom or what have you. I'm just trying to figure out what an entity is under your definition. Well, an entity is any organization, group, you know, association. Each of us here has a Rolex watch. Are we a Rolex entity? No, Your Honor, I don't think that's the situation we're confronting here. I mean, I certainly don't have one, so, I mean, what you're dealing with there is a, what we're dealing with here is an entity that is in all practical respects not distinguishable from a corporation. Like, I haven't heard my colleague describe a little bit about what TORN tokens do, and I just described, you know, the voting rights that you get. In fact, you're, you know, you're able to use your TORN to get a share of the profits, essentially dividends, you know, all of these things in that respect are not meaningfully different from the shareholders in a corporation. And at the bottom. What's the best proof that it's an entity? I mean, typically we would go to the Secretary of State's office and there it is, a certificate, officers, you know, and so on and so forth. What's the best evidence that we can look at in this case to ascertain that this is an entity in the traditional sense, even though we're talking about cryptocurrency and apps and software? I think you can look at the evidence that Treasury marshaled about how the entity described and marketed itself and then developed the TORN token as essentially stock. And I think, to be clear, this is far more formal and far more elaborate than lots of entities that get designated under this statute. Hamas, Al-Qaeda, you know, any number of entities don't have an incorporation certificate with the Secretary of State, right? I mean, we have instead an organization that gets identified and, you know, whether the, every single member of that organization is identified in advance is a, is pretty different. What you're basically doing is equating TORNADO with a conspiracy. I mean, Hamas, Holy Land Foundation, Al-Qaeda, ISIS, they're all basically conspiracies to violate the law. But TORNADO cash is not a conspiracy. Well, you know, I mean, I don't think they have to be a conspiracy to be sanctionable. I mean, I don't think, you know, even if you have. Well, I'll give you an example of another sanctioned entity that it's not a conspiracy to violate the law. Your Honor, I mean, I don't think it violates. Your Honor, I. In other words, what you're trying, what, the whole point of this statute is to go after bad actors and take away their money, right? Or to make it difficult for them to access money within the U.S. Well, and to make sure that North Korea can't use this, this service. I understand. To further its own agenda. You know, the Russians might be using it to send drones to Iran, for all we know. But, because it, there's an, anyway, I don't want you to use up all your time on entity, but it just seems like a very slippery concept. How many millions of transactions has TORNADO cash processed? I don't know the exact number of transactions. I do. But it is in the millions, right? It's a lot. And, I mean, I do know that the record just, the, the record here shows that something like $7 billion worth of cryptocurrency went through the service in the three-ish years it was in operation. So, and you've mustered a grand total of how many examples of money laundering? Well, I mean, I think plaintiffs themselves. I think it's three, right? But, I mean, the three that we're talking about are instances where North Korea stole hundreds of millions of dollars of cryptocurrency. And so I don't think it's, you know, I don't think we can say, oh, it was only three. So, you know, no big deal. But why aren't the existing designations of the Lazarus Group or North Korea, why are they not sufficient to achieve your purpose? Okay. So I think we're moving off the entity question at this point. I'd like to come back to just one point on that before we do. But, but to be clear, the designation of additional entities that assist North Korea in its own, you know, in its carrying out its activities or assist malicious cyber activities and carry, you know, you know, and enable the carrying out of those activities is itself an additional good. I mean, these services become less effective, less able to assist those, those entities like North Korea and others when fewer people use them. That's the whole point of one of these services is that the more people who use it, the more effective it is at hiding transactions and laundering money. So. How many, how many anonymizing computer programs are out there? I don't know, Your Honor. But just before we move off the entity question completely, I would just point out, again, there's no real dispute as far as I can tell that there is an entity out there called TornadoCash and that, you know, it had a self-conception of being an entity that, you know, if you look at page 936 of the Record on Appeal, there's a, you know, quoting a post from TornadoCash that says, you know, here our governance is such that our community, i.e. torn holders, can, you know, control what we do and that all those folks sort of made up the entity. But there's no dispute that there's an entity out there. And if there's an entity, which I don't take plaintiffs to dispute, then there's no doubt that the same transactions, the same things would be blocked at the other end because whether you define it as all the torn holders or only some of the torn holders, the resulting property is the same. The resulting transactions that are blocked are exactly the same and it changes nothing from the standpoint of the ultimate result of the designation. But when you say, but now as to this entity though, you're not taking away all their torn, right? You're confiscating the torn? I mean, I don't know that we can. The whole point is these are like shareholders in a corporation. So you're taking away, you're shutting down torn, you're confiscating the value of torn. Even in that circumstance, we don't always. That's right or not. We don't confiscate property in this scheme. No, but you make any transaction by an American and it's illegal, so therefore you're shutting it down and confiscating it. Your Honor, we're not confiscating anything. You're shutting it down. I mean, what we're saying is that people can't use the service. No, you're shutting down the immutable contracts, not the mutable ones. Let's move over to property. Okay, sure. I mean, on the property point, there's two separate issues. I mean, the two separate ways, independent ways in which this is property under the statute. So the first is that, you know, this is a service. I mean, Tornado Cash created and maintains a particular service that provides anonymization of cryptocurrency transactions. My colleague just told you they're not challenging the definitions articulated in the regulations here. One of the things described in the regulations is a service. And I don't think there's any doubt that when you use Tornado Cash, what you were doing is you were getting the service of anonymizing your cryptocurrency transaction in a way that, you know, is very beneficial if you're something like North Korea or some other actor who's engaged in this kind of activity. But they're saying it's not property. So they don't say that with respect to the service, Your Honor. They only say that with respect to these contracts. They ultimately argued that it's not a service, but let's go to property. Correct. Well, Your Honor, I mean, I'm happy to go to... I just want to point out, if it's a service, then the contract point is totally irrelevant. I mean, there's... How do you have a service without a server? Your Honor, they have created and developed and put the service out there in the same way. But now you're leading back to this vague entity called Tornado, but you don't have a service without a server, which is a person behind the service, right? I mean, Tornado Cash is that. No, you're saying they're an entity. They're just in, is all you're saying. So what you have is a service without... And that's the immutable contracts. And here's the analogy that came to my mind. You have the founder. To me, the people... I disagree with you that Tornado Cash runs something. It's a set of computer programs. And the people who drafted those programs are like people who take in wounded animals. And they repair the... They treat them and they nurse them and they put them back into health. And then they set them out in the wild. The deer or the eagle or the snake or the skunk that has been taken care of is no longer the property of the person who is its temporary custodian, correct? I agree that the person doesn't own the eagle anymore. And these are immutable contracts, which means that the key to modify... Those are the only ones that you're sanctioning. The key to modifying those has been burned up or something done to it on the internet, so they will never be there. I mean, they will never be able to be disabled. Your Honor, there are several things in there that I think just factually aren't quite right. So first of all, we haven't just designated immutable contracts. Plaintiffs themselves concede we've designated a whole host of contracts, some of which they agree are mutable and some of which they say are immutable. But that's because all of them together make up the service. And I want to address your questions about property, but we're back to the service. So in the same way that... And just to stick with the service for a second, because again, that's an independent basis and they haven't said the mutability or immutability of the contracts is relevant to whether it's a service or not. When I go... So when I want to move money between accounts at the bank, whether I go to the teller to do it or whether I use computer code that the bank has written and put out there on the internet, doesn't change that what I'm receiving is banking services. And at the end of the day, what is being provided here is a service. And you can see over time, Tornado Cash repeatedly changed and developed and updated and improved this service. They added the relayers, they added Tornado Cash Nova, which was a new way of making particular types of transactions. They developed a program where they paid people to put money in the pools and keep it there. And then it's up to the individual user to decide whether it's going to use what kind of contract, right? Tornado Cash has no control over what the user does. Right, so I mean, they certainly don't control what the user does, but the... Or how it operates. They absolutely control how it operates. I mean, I just gave you a list of examples of times where they changed the service. Now, with respect to the contracts, my colleagues don't seem to dispute that when Tornado Cash originally wrote these contracts and put them out there for people to use, those represented unilateral contracts and those were property. They're not contracts or computer programs. I don't know where the word contract came into things, but... Well, I mean, they're called smart contracts, I think for a reason, which is that they express terms that people can accept by performance. And so I don't think there's anything unusual about that. Well, except in the law, they are not contract. Again, my colleagues here have not disputed that these were contracts when they were initially created and put out there. And their theory is instead, at the point where Tornado Cash said the same terms apply, but now we're not gonna revoke or alter those terms, it became less of a contract or not a contract somehow. And I don't really see how that follows from what happened. But again, Your Honor, if you have concerns about the contract portion of it, this would still be a service. And it's no question that services can be our property under the statute and that therefore, we can block transactions involving that service just as easily as we can block transactions involving any other. Is there anything else you wanna say beyond your briefing on the Loper-Bright point? No, I think, Your Honor, essentially at this point, I don't think there's much dispute between the parties about how it all shakes out here. I mean, there's no, I mean, they haven't challenged the regulation, regulations here. They haven't questioned the accuracy or legitimacy of those. Well, I was just telling you- Well, I thought HIPAA has this sort of generic delegation of power. You wouldn't dispute the right. This generic delegation of power to promulgate rules and definitions and is that generic sort of sweeping delegation of power sufficient to mandate broad judicial deference to OFAC's definitions? So, again, I don't think that's presented, but just to answer your question, I mean, in the national security and foreign affairs space, courts have always, separate and apart from Chevron, recognized that as a separation of powers matter, there's a certain amount of respect due to the legislative and executive branches as the ones responsible for those things. So, I mean, this court has cited Hague versus AG examples of that kind of respect, separate and apart from any sort of Chevron point. And so in this, I mean, HIPAA itself is, I mean, the whole statute is a delegation to the president, to the executive branch to identify foreign threats, to address those threats, to provide definitions necessary to carry out meeting those threats. So I don't think you can just say, well, it's a generic sort of delegation of authority. It's a delegation that's happening in a particular context and also carries with it, not just sort of generally you can make rules, but specifically to prescribe definitions, you know, and prescribe itself has some force. So, again, I don't think it's presented here for decision, but I don't think it's an area that makes any difference. So, I mean, just to sum up, as I see my time is up, at the end of the day, what we have here is a group of folks who profit from owning essentially shares in an entity called Tornado Cash that described itself as Tornado Cash, that hired people, posted job listings, carried out work on the service over a substantial period of time and continued to work on that service, frankly, in an effort to avoid US sanctions. And then, you know, so that's obviously an entity that can be designated. And in any event, whether it should include all torn holders or only some of them, doesn't change ultimately anything about the designation. It's plainly harmless with respect to this particular designation. And at the end of the day, whatever you think about the contracts question, this is a service. General Cash provided a service and that service can be blocked as a form of property. Plaintiffs don't dispute that that is part of the agency's authority. If this were only a mutable smart contract, would you still shut it down?  I mean, I don't see, Your Honor. Well, but mutable are visible, right? Visible and transparent, right? Your Honor, all of the contracts are visible. I think the- But why don't you shut down all of the Bitcoin industry on that score? Because, I mean, Your Honor, the- Blockchain, whatever. Your Honor, Tornado Cash is operating a particular service. And if you look at the particular, that's what's being targeted. It's made up of a bunch of smart contracts in the same way that my banking service and my tax preparation service may use software to carry out, to deliver the service. But- Why don't you shut down your tax software because it can be used to commit fraud on the part of foreign entities? Your Honor, I mean, I don't think it's anything like what's happening here. Why do you feel- If there was a foreign company that was, you know, assisting North Korea in doing it through tax software, then- North Korea is just an example. It could be any malefactor, I have no doubt. Why did the Treasury Department say it might need further legislation? Your Honor, I think if you, I'm glad you brought that up because that particular document, if you look at it, there are parts of that document where it says our existing authorities, it's a letter to Congress after the October 7th Hamas attacks about Hamas's own use of cryptocurrency in various ways and other options that Congress might want to consider. And there are parts of that document, for example, on page one, I believe, where it says, look, some of our existing authorities don't cover particular types of transactions, like under the Bank Secrecy Act. On page three, if you go look at the material my colleague cited, what the agency simply says is, look, there is this litigation that's out there and you could make it, you could make it all go away if you wrote the exact words into the statute that would mean it all goes away. But that doesn't mean that the agency had any doubt about whether these particular, this particular entity, these particular transactions are covered under IEPA. And I don't- That sort of gets back to low for bright, doesn't it? Back to the idea with Chevron or major questions, if you could make a lot of things easier by having Congress write more explicitly. Right, but I mean, this statute has, the Supreme Court has recognized repeatedly as other courts of appeals, and this court has recognized- Well, that's because usually you're talking about property that is easily graspable. I mean, again, Your Honor, services of all kinds, consulting services, travel services, any number of services are not, I'm sorry, I don't- No, I apologize for my stupid questions, but your light is on, so-  Thank you. Thank you, Your Honors. Thank you, Your Honors. Let me start just by clarifying the role of North Korea in all of this, and then I'll address the statutory requirements. So as Judge Willard pointed out, the administrative record identifies three illicit uses, and to be sure, as my friend Mr. Hinshelwood said, they were big uses. They amounted to around $600 million. I did not hear Mr. Hinshelwood to dispute, nor could he, that the majority of the uses of Tornado Cash are legitimate ones, and the effect of this designation is to render all of those uses impermissible. So, for instance, for our clients who have cryptocurrency that is currently in the Tornado Cash mixing service, they have no ability to access those assets absent a license. And the critical thing to keep in mind is that those uses don't have North Koreans or anyone else, for that matter, involved in them. Those uses are people putting their cryptocurrency into the Tornado Cash mixing service with the right to take it out in an anonymized way. Those people are all American citizens, and those uses are now prohibited. I wanna just underscore how far removed this is from the paradigmatic use of IEPA. My friend talked about the fact that Treasury obviously regulates American financial institutions quite routinely in this regard. Typically, what takes place, as we point out in the statement to our brief, is that the Treasury Department will designate some foreign national, say it designates Kim Jong-un, or it designates his assets, for instance, his airplane or assets that he might have in an American bank. And the effect of that is, of course, to freeze those assets. This is very different. And for purposes of the statutory arguments that are being made today, again, the North Koreans are not on the scene, to the extent that the government has a theory here that there is some foreign national who has an interest in the property. The foreign nationals are simply non-Americans who are among the founders or the holders of Torn, and we're not disputing that some number of those people are not Americans. That is the hook that the government is using now in an effort to shut down the use of these services by American nationals. Let me turn now, very briefly, to the three statutory requirements at issue. With regard to the entity requirement, I think Judge Jones well exposed the problem with the government's argument. The government can satisfy the conceded requirement that all the participants of the entity have a common purpose, only at an impossibly high level of generality. And again, it is telling that the government has backed off the district court's conclusion of what the shared common purpose is to this narrower purpose of profiting from Tornado Cash. And just to underscore, the only people who profit from Tornado Cash are not just Torn holders, they are Torn holders who stake their tokens. And the way in which they profit, and I sped through this in my opening, so let me spend just a few seconds on this in rebuttal. The way they profit is that if they stake their Torn, they get the fees from the use of these relayer contracts. They're not the fees from the underlying cryptocurrency transactions. They get a share of those fees. But again, it is conceded that it is only a small subset of Torn holders who do so, and that's why the shareholder analogy. Does the substance of the common purpose matter to our analysis of whether a Tornado Cash is an entity? So I think there has to be some common purpose, but I think the key is it's gotta be a purpose that renders this not just a group of individuals. Because of course, keep in mind that the government conceded in its designation that it wasn't designating the individuals at issue here. So there has to be something that renders it an association. It doesn't have to be incorporated. It still has to be. So the purpose here you would say was just profiting from? Yes, and that is not a shared purpose here, and certainly not a shared purpose for which the members of the entity came together. On the issue of property, I think I would just say one thing, given the shortness of time, and that is that my friend sets great store today in the regulatory term service. Now we aren't contesting that there can be some circumstances in which a service or a contract could be property, where you have a right to use a service or a right in a contract that is itself valuable, that is capable of being owned. But he seeks to eliminate the capability of being owned. He says, well, if a bank provides me service, that's property. No one would understand that under any colloquial sense to be property. And for that matter, the right to go to Bank of America, or the right for that matter to use Tornado Cash is not property either, for the simple reason that anybody can do it. It's like the right to sunlight. It's not property in any conventional sense of the term. And notably, the Torn tokens themselves are not the property that is being designated here. So the government has to show that it is the Tornado Cash service. And notably, to the extent that my friend said anything about the district court's actual reasoning, which was that it's a contractual right, he offered no answer to who the counterparty is. He just said, well, it's Tornado Cash. Tornado Cash is a known thing out there in the world. It is a known form of software, but it is not a counterparty in any traditional sense. There is no Tornado Cash. And I think on the issue of interest, I would just say that the lack of even a beneficial interest here, in some sense, flows from what we say, both with regard to the absence of an entity and the absence of property. The only person who could even arguably have an interest is that small subset of persons who, in fact, profit from Tornado Cash and not the entire entity that the government sought to designate. We would ask that the court, in its opinion, reach both the entity issue and the property issue to save us from having to be back here in 18 months when the government seeks to designate a narrower entity and re-litigating the issue of whether or not there is property. And the judgment of the district court should be reversed. Thank you. All right, thank you, sir. Thank you.